| **Wall v Chauca** |
|:---:|
| 2026 NY Slip Op 30528(U) |
| February 22, 2026 |
| Civil Court of the City of New York, Queens County |
| Docket Number: Index No. L&T 763-25 |
| Judge: Logan J. Schiff |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF QUEENS: HOUSING PART F
-----------------------------------------------------------------X
ROBERT WALL

                                                  Index No. L&T 763-25

                   Petitioner

         -against-                              **DECISION**
                                                **AFTER TRIAL**

DENNIS HENRY CHAUCA

         and

DEPARTMENT OF HOUSING PRESERVATION
& DEVELOPMENT

                  Respondents
-----------------------------------------------------------------X

Present:       Hon. <u>Logan J. Schiff</u>
                 Judge, Housing Court

**BACKGROUND**

Petitioner Robert Wall, the then-tenant of the third-floor apartment in an owner-occupied, two-family home in Queens, New York, commenced this Housing Part (HP) proceeding by order to show cause dated April 23, 2025, seeking a finding of harassment and related relief under NYC Admin Code (Housing Maintenance Code) § 27-2005(d) *et seq.* against his then-landlord Dennis Chauca. Both parties were pro se during the trial, which took place on December 15, 2025, and February 3, 2026.

The undersigned previously presided over a holdover proceeding between the parties wherein Respondent Chauca sought to recover possession of the subject premises following the termination of Petitioner's unregulated, month-to-month tenancy, which was commenced by Petition dated December 3, 2024, under LT-319072-24/QU/. A trial was held on August 11, 2025, and resulted in a judgment of possession following a decision after trial dated August 14,

1

2025. Mr. Wall was legally evicted by a marshal on or about October 29, 2025. Thereafter, the subject HP proceeding was one of several harassment trials administratively reassigned at random from Part C (the HP Part) to Part F, the undersigned's part, by notice dated November 14, 2025.

**THE TRIAL**

Petitioner testified that he rented the subject, third-floor apartment from Respondent, who owns and lives in the home on the first two floors, on or about April 2023, based on an oral agreement to pay $1,500 per month. Petitioner testified that, in June 2024, he learned his electricity bill included a shared meter, and that he therefore stopped paying it and communicated his concerns to Respondent. Petitioner moved into evidence a text exchange between the parties from June 28, 2024, concerning the disputed the electrical account, in which Respondent writes that the matter can only be resolved by Petitioner's moving out.

According to Petitioner, relations between him and Respondent began to rapidly sour, culminating on July 16, 2024, when Respondent physically assaulted him. Petitioner admitted a 35-second video of Petitioner sitting in his car outside of the premises, in which Respondent approaches him on a bicycle, props the car door open with his arm, and begins to scream at Petitioner about a notice of an electrical shut-off he received in the mail. Respondent further complains about Petitioner's failure to pay the rent. Petitioner's legs are visibly shaking, and he repeatedly yells and curses at Respondent to leave his vehicle, initially to no avail. Although not clearly captured on the video, Petitioner credibly testified that Respondent punched him in the chest during the interaction. Respondent for his part conceded that the video is genuine and depicts a moment of frustration, which he claimed was occasioned by an earlier exchange that day, not pictured on the video, where Petitioner told Respondent that it took his last landlord

2

[* 2]

years to evict him. However, Respondent denied punching Petitioner.

Petitioner then testified that after the incident in his car he immediately called the police, and while he was waiting for them to arrive, Respondent, a Fire Department Chief with a license to carry a firearm, texted him a video of Respondent firing a gun in the woods, which Petitioner interpreted to be a physical threat to his safety. A copy of the video, which Petitioner stated has the incorrect date stamp because he previously modified the file's size so that it could be more easily emailed to the court, and for which he could not locate the original file or accompanying text message, was admitted into evidence. Petitioner stated that when the police arrived, he showed them the video of Respondent firing a gun, and they approached Respondent and told him that if he did not deny that he was the person in the video, they would have to arrest him. Petitioner stated that Respondent lied to the police and told them that he was not depicted in the video, and that police then left the scene after preparing an incident report. A copy of the police incident report was introduced into evidence. Respondent, for his part, testified that while he is in fact the person firing the gun in the video, it merely shows him engaging in target practice during a formal firearm safety lesson in connection with his securing his gun license, which he claims he texted to Petitioner a year earlier when they were on good terms because Petitioner mentioned he also wanted a firearm license. Respondent reiterated that he did not re-send this video on the date in question, and that it was therefore taken out of context. Respondent was not able to locate the text exchange on his phone. Respondent further denied that the police ever asked him about the gun.

Petitioner testified that after the event in his car, Respondent embarked on a campaign of harassment designed to force him to vacate his home. Petitioner introduced video footage of a surveillance camera and motion sensor activated alarm system Respondent placed directly

3

[* 3]

outside the door of the home, the only apartment on the third floor, approximately 8 feet high along the wall, which would make the announcement: "Hi, you are currently being recorded" and then emit a very loud high-pitched blaring noise for several seconds every time Petitioner entered or exited the home. In addition, Petitioner offered video footage of Respondent regularly talking to him unprompted through the alarm system and engaging in what appeared to be hostile communication. Respondent in turn testified that he was unaware the alarm system bothered Petitioner. He then introduced his own video footage showing Petitioner repeatedly attempting to block or disable the surveillance camera as he left his home, including by attaching a cloth to a stick to block the camera lens, actions that seemingly undermined Respondent's position that he was unaware the cameras disturbed Petitioner.

Petitioner further testified that Respondent leveraged his status as Fire Department Chief to have Respondent falsely arrested for allegedly kicking Respondent's license place on December 9, 2024, which Respondent then used to secure a temporary order of protection as a means of forcing Petitioner to vacate the premises. Petitioner testified that he was arrested and held by the police for 16 hours, and that upon his release he consulted with an attorney and decided to temporarily relocate to a friend's apartment in Manhattan in February 2025 to avoid a potential violation of the order of protection. Petitioner testified that he moved on February 9, 2025, and that he took many items, including his large furniture, but left behind various other personal effects, including a bed, dishes, groceries, an air conditioner, and a dresser.

As to this incident, Respondent testified that he called the police because Petitioner damaged his license plate. Respondent introduced somewhat blurry surveillance footage of an individual with a similar body type to Petitioner, either tapping or gently kicking—the footage is unclear – a car license plate for a split second as proof of the incident in question. Petitioner

4

[* 4]

denied that he was the individual depicted on the video. Respondent further testified that after the arrest, Petitioner entirely vacated the premises and introduced video footage of Petitioner moving several pieces of furniture and a bed frame, but no mattress, into a moving van on February 9, 2025. Respondent conceded that Petitioner never returned the keys or signed a surrender agreement, necessitating his continuing with the eviction proceeding.

Petitioner offered into evidence a criminal court disposition, dated March 20, 2025, reflecting the dismissal of the criminal charges levied by Respondent and the accompanying temporary order of protection. Petitioner testified that, upon dismissal of the charges, he immediately returned to the premises but found that Respondent had installed a large metal gate with a lock barring his entry and therefore called the police to assist him. Petitioner introduced video footage of him returning with a police escort on April 2, 2025, to an apartment that was almost entirely vacant other than a small painting and a couple household items. Respondent is depicted in the video telling the police that Petitioner moved out. The officers express skepticism after Petitioner points out that he is the owner of the painting, and they direct the parties to resolve their differences in housing court. Petitioner testified that Respondent must have thrown away his remaining personal belongings, as no other person had access to the apartment. Respondent denied this allegation, reiterating that Petitioner removed all his belongings on February 9, 2025. Following this incident, Petitioner commenced an illegal lockout proceeding under LT-713-25/QU by order to show cause dated April 14, 2025, which was signed with an initial return date of April 23, 2025, but ultimately dismissed without prejudice for lack of service.

Petitioner stated that in February 2025, he called the Department of Buildings (DOB) to report the condition of the balcony outside of his third-floor apartment and the exterior wood

5

staircase leading to the balcony, the only means of ingress and egress, which was rotted and structurally unsound. As a result of the complaint, DOB issued a violation dated February 28, 2025, finding that the stairs and balcony were at risk of collapse. The violation culminated in the issuance of a temporary vacate order, dated April 9, 2025, which Petitioner stated he observed posted on the door in mid-April 2025, when serving the illegal lockout papers. Petitioner testified that the conditions underlying the vacate order, which remain open on the DOB website, were never corrected, and, as a result, he was never able to return to the premises for living purposes prior to his legal eviction in October 2025.

Respondent testified in rebuttal and vehemently denied harassing Petitioner. He stated that he invoked his legal right to call the police after Petitioner kicked his car's license plate; that after he obtained a temporary order of protection, Petitioner entirely moved out of the premises and never returned apart from the one supervised access date with the police after Petitioner filed an illegal lockout, during which an empty apartment is depicted in the video previously admitted by Petitioner. Respondent expressed some regret for his actions in relation to the incident on July 16, 2025, inside of Petitioner's car, and explained it as frustration stemming from Petitioner not paying his electric bill, resulting in a shut off notice, and his discovery that Petitioner was evicted, for nonpayment of rent, from another apartment owned by a different Fire Department Chief, leading Respondent to speculate that Petitioner may be targeting FDNY employees.

**ANALYSIS AND DETERMINATION**

Housing Maintenance Code (HMC) § 27-2005(d) provides that:

"The owner of a dwelling shall not harass any tenants or persons lawfully entitled to occupancy of such dwelling as set forth in paragraph 48 of subdivision a of section 27-2004 of this chapter."

6

[* 6]

HMC § 27-2004(a)(48) defines harassment as "any act or omission by or on behalf of an owner that (i) causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy," including, inter alia:

> "using force against, or making express or implied threats that force will be used against, any person lawfully entitled to occupancy of such dwelling unit" (HMC § 27-2004[a][48][ii][a]);
>
> "removing the possessions of any person lawfully entitled to occupancy of such dwelling unit" (HMC § 27-2004[a][48][ii][e]); and
>
> "other repeated acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of any person lawfully entitled to occupancy of such dwelling unit and that cause or are intended to cause any person lawfully entitled to occupancy of a dwelling unit to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy" (HMC § 27-2004[a][48][ii][g]).

The HMC further provides that:

> "there shall be a rebuttable presumption that such acts or omissions were intended to cause such person to vacate such dwelling unit or to surrender or waive any rights in relation to such occupancy, except that such presumption shall not apply to such acts or omissions with respect to a private dwelling, as defined in paragraph six of subdivision a of section 27-2004" (HMC § 27-2004[a][48][ii]).

Here, the subject premises is a two-family home that constitutes a private dwelling under HMC § 27-2004(a)(6). Therefore, Petitioner does not benefit from the rebuttable presumption of harassment applicable to multiple dwellings and must establish that Respondent acted with the requisite *mens rea*, or in other words, that Respondent, through his conduct, subjectively intended to cause Petitioner to vacate or waive his rights in relation to his tenancy prior to Petitioner's legal eviction in October 2025.

Notwithstanding the heightened burden of proof applicable to private dwellings, Petitioner amply demonstrated that Respondent engaged in tenant harassment in violation of the

7

[* 7]

HMC. While Petitioner offered a range of documentary, video, and photographic evidence in support of his detailed, credible testimony, one piece of evidence stood out: the video of Respondent biking unsolicited up to Petitioner, who was sitting peacefully in his car, and violently confronting him while demanding he pay his electric bill and the rent, and ignoring Petitioner's plea that he leave the vehicle. This conduct, which goes far beyond minor expressions of frustration or personal animus that could be excused in the context of a dispute between neighbors, has no place in a landlord-tenant relationship (*cf. Garcia v Adams*, 71 Misc 3d 1205 [Civ Ct, Kings Co 2021]). Further, the circumstances and nature of the behavior – an unprovoked assault in the context of a demand for rent – is such that the court infers a malicious intent on Respondent's part to compel Petitioner's vacatur through his violent and threatening conduct (*see generally People v Rodriguez*, 17 NY 3d 486 [2011]).[1] Even assuming that there could be a non-harassing motive for Respondent's behavior, which occurred only weeks after Respondent texted Petitioner that he wanted him to move out of the apartment, Respondent failed to offer any meaningful rebuttal. Respondent testified that he lashed out in frustration because in an earlier conversation the same day of the incident, Petitioner told him how long it took for his prior landlord to evict him. If anything, this purported justification lends credence to the notion that Respondent's actions *were intended* to cause Petitioner to vacate, an act of harassment under the HMC (*see* HMC § 27-2004[a][48][ii][a]); *Negron v Foster*, 2021 NYLJ LEXIS 139 [Civ Ct, Bronx Co 2021]). The court likewise finds that Petitioner credibly testified

---

[1] While the court cannot determine from the video if Respondent struck Petitioner with his fist as Petitioner claimed, the degree of forcible contact involved in this encounter likely meets the definition of an assault, which in the context of civil tort action merely requires "proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact" as opposed to a battery, which requires " bodily contact, made with intent, and offensive in nature" (*M.C. v B.H.*, 241 AD3d 1522 [2d Dept 2025] [internal citation and quotation omitted]).

8

[* 8]

that Respondent texted him a video of Respondent firing a gun shortly after the altercation in the car, and that such communication was intended to threaten and coerce Petitioner into vacating, also constituting harassment.

Further, the court concludes that Respondent's installation of a motion sensor activated alarm system directly outside Petitioner's front door, which played the recorded message: "Hi, you are being recorded," followed by a several-second-long, loud, high-pitched noise every time Petitioner entered or exited his home, was an act that interfered with Petitioner's peace and repose, lacked any conceivable legitimate purpose rooted in safeguarding the subject property, and was intended to cause Petitioner to vacate. Such conduct constitutes harassment (*see* HMC § 27-2004[a][48][ii][g]; *T & G Realty Co. v Hawthorn*, 64 Misc 3d 1214 [Civ Ct, New York Co 2019]; *cf. Roach v 215 Sterling LLC*, 74 Misc 3d 1221 [Civ Ct, Kings Co 2022]).

Finally, the court credits Petitioner's testimony that he left belongings in the subject apartment and did not surrender or abandon the premises in February 2025, when he chose to temporarily relocate after Respondent obtained a temporary order of protection against him for allegedly damaging his license plate. Such testimony is logically consistent with Petitioner's decision to promptly return to the apartment with the police on April 2, 2025, after the criminal charges were dropped on March 20, 2025, his subsequent filing of on an illegal lockout proceeding on April 14, 2025, and his vigorously contesting the landlord's right to possession in the holdover proceeding. In the absence of any evidence offered by Petitioner that Respondent tendered the keys to the premises, legally surrendered, or abandoned the premises, the court draws the inference that Respondent disposed of Petitioner's remaining belongings (*see Medina v Essex Estates*, 72 Misc 3d 1225 [Civ Ct, Kings Co 2021]).

9

Accordingly, it is hereby determined that Respondent engaged in prohibited acts of tenant harassment constituting a Class C violation under the HMC (*see* HMC § 27-2115[m]), and it is ordered as follows:

(a) In the absence of specific evidence of Petitioner's monetary losses, the court imposes statutory damages in the amount of $1,000 (*see* HMC § 27-2115[o]; *K.J. v Gradzki*, 84 Misc 3d 1250 [Civ Ct, Queens Co 2024]).

(b) Given the severity of the conduct, including willful and violent behavior by Respondent directed at Petitioner to secure his vacatur, and the evidence that Respondent discarded Petitioner's belongings, the court finds it appropriate to award punitive damages (*see* HMC § 27-2115(o]). Punitive damages serve to punish "morally culpable" conduct and to "deter a wrongdoer and others of like inclination from repetitions of the same or similar actions" (*Caban v Silver*, 2019 NYLJ LEXIS 458 [Civ Ct, Kings Co 2019] [internal citation and quotation omitted]; *see also Gradski*, 84 Misc 3d 1250; *Leung v Zi Chang Realty Corp.*, 74 Misc 126 [App Term, 1st Dept 2022]). Accordingly, the court awards $4,000 in punitive damages.

(c) The clerk is directed to enter a $5,000 money judgment in Petitioner's favor as against Respondent comprising the cumulative statutory and punitive damages.

(d) The court imposes civil penalties in the amount of $2,000 as against Respondent Chauca (*see* HMC § 27-2115 [m][2]) and directs the clerk to enter a money judgment for same in favor of statutory co-Respondent Department of Housing Preservation & Development.

(e) Inasmuch as it is undisputed Petitioner no longer resides in the premises, the court will not issue an injunction restraining further acts of harassment.

This order is without prejudice to Petitioner's pending action in civil court against Respondent seeking monetary damages for illegal eviction and property damage (CV-015003-25/QU). While that matter involves transactions and occurrences that overlap with the instant HP proceeding, the claims asserted are outside of housing court's jurisdiction and therefore may be pursued in a parallel plenary action (*see Wheeler v Linden Plaza Preservation LP*, 172 AD3d 608 [1st Dept 2019]; *Rostant v Swersky*, 79 AD 3d 456 [1st Dept 2011]; *Town Mgt. v Leibowitz*,

37 Misc 3d 49 [App Term, 2d Dept, 2d, 11th & 13th Jud Dists 2012]; *Prospect Resources Inc. v Levant Capital N. Am., Inc.*, 237 AAD 3d 550 [1st Dept 2025]).

This constitutes the decision and order of the court.

Dated:     Queens, New York
           February 22, 2026                            _____
                                                        Hon. Logan J. Schiff, J.H.C.

APPROVED
lschiff , 2/22/2026, 10:56:53 AM

11